ROSENN, Senior Circuit Judge.
 

 This appeal raises an interesting question relating to the importance for a debtor to maintain and preserve the debtor’s financial records for a reasonable period prior to filing for bankruptcy to allow the bankruptcy court to make an intelligent
 
 *63
 
 inquiry of the debtor’s financial status. In this case, Frank Sehifano (the “Debtor”) filed for personal bankruptcy under Chapter 7 of the Bankruptcy Code, frustrating the efforts of Alfred and Henry Razzaboni (the “Razzabonis”) to collect a $200,000 judgment against him. The Razzabonis alleged that under 11 U.S.C. § 727(a) the debt should not be discharged because the Debtor transferred or concealed assets, made false oaths, and failed to keep adequate records. The bankruptcy court granted summary judgment to the Debtor on all three claims, and the United States Bankruptcy Appellate Panel for the First Circuit (“BAP”) affirmed. The Razzabonis timely appealed to this court.
 

 We agree that the Razzabonis have failed to produce sufficient evidence to survive summary judgment on their claims of concealment of assets and false oaths. However, we believe that there is a material issue of fact as to whether the Debtor failed to maintain adequate records. Thus, we will affirm in part, reverse in part and remand for trial on the issue pertaining to the adequate maintenance of records.
 

 I.
 

 We recognize the bitterness that often prevails when creditors are frustrated in the collection of a just debt due to the debtor’s filing a petition in bankruptcy. Although creditors often challenge the discharge in bankruptcy of the debtor on grounds of fraud, concealment of assets, or other justifiable grounds, the challenge cannot survive summary judgment on mere speculation or accusation. Creditors must produce competent evidence.
 
 See Boroff v. Tully (In re Tully),
 
 818 F.2d 106, 110 (1st Cir.1987). Yet, in producing competent evidence, a creditor may be hindered by the debtor’s unwillingness to turn over financial records or the debtor’s failure to maintain adequate records that would document any potential fraud
 
 or
 
 wrongdoing. Because the debtor is often the gatekeeper to any incriminating evidence, the Bankruptcy Code will avoid a discharge if a debtor fails to maintain adequate records to reasonably ascertain his financial condition. 11 U.S.C. § 727(a)(3).
 

 The bankruptcy court in this proceeding granted the Debtor’s motion for summary judgment from the bench without a written opinion or a statement of facts. Upon appeal, the BAP filed a written opinion recounting the relevant evidence of this case and affirming the bankruptcy court on all counts. The Razzaboni’s claims of concealment, false oaths and failure to maintain records involve three assets relevant to this case: the construction companies owned by the Debtor and his brother, the Debtor’s family residence, and gifts and loans paid by family members to the Debtor. We review the evidence from the record regarding each of these assets in the light most favorable to the Razzabonis as the non-moving party.
 
 Pacific Ins. Co., Ltd. v. Eaton Vance Mgmt,
 
 369 F.3d 584, 588 (1st Cir.2004).
 

 A. The Sehifano Corporations
 

 The Debtor has been involved with several family owned construction companies over approximately 25 years. His original company, Frank Sehifano Building and Design Corporation (the “Sehifano Corporation”) contracted with the Appellants, the Razzabonis, for a construction project that resulted in the Razzabonis suing the Debt- or in Massachusetts state court. The Raz-zabonis obtained a default judgment against the Debtor personally in the amount of $200,000 on January 5, 1995. The Debtor began making payments on the judgment until he filed a bankruptcy petition under Chapter 7 of the Bankruptcy Code on March 29,1996.
 

 
 *64
 
 The Schifano Corporation was dissolved in 1993, and the Royal Crest Corporation (“Royal Crest”) was formed the same year to take its place. The BAP’s opinion acknowledged that the record was not clear on this point, but it appears that Royal Crest was originally formed with the Debt- or as the President, but with the Debtor’s brother, Joseph Schifano, as the sole shareholder. Then, in 1995, when the debt to the Razzabonis threatened the business, Joseph Schifano claims that he transferred ownership of Royal Crest to the Debtor so that Joseph could start a new business, Northlantic Construction Corporation (“Northlantic”). Neither the Debtor nor Joseph has explained what consideration, if any, was paid for the transfer of Royal Crest to the Debtor. The Debtor has produced no records of this transaction.
 

 Joseph Schifano claims that he capitalized Northlantic with approximately $16,500 of his own savings, although no records have been produced documenting this capitalization. Joseph admits that he created the company to avoid the creditor-related problems with Royal Crest. Northlantic occupies the same office space as Royal Crest, uses all the same equipment, and employs the same people. Northlantic pays the Debtor a salary of $500 per week, and pays the Debtor’s wife $800 per week for book keeping. North-lantic also made loans to the Debtor of approximately $16,500 over several months in 1995, just after the corporation was formed.
 

 After Joseph Schifano formed Northlantic to replace Royal Crest, the Debtor extracted $38,000 from Royal Crest in what he described as “loan repayments.” The Debtor supplied the cancelled checks to document these payments, but did not supply any records of the original loans that he alleges he had made to Royal Crest. The Debtor and his wife do not maintain a bank account, so they do not have any method of proving their payments made or income received. They pay all of their bills in cash or money orders. The Debtor’s wife stated that they do not maintain a bank account so that the Internal Revenue Service (IRS) cannot levy their funds.
 

 B. The Stoneham Property
 

 Since 1987, the Debtor and his family have resided in a home at 12 Dapper Darby Drive in Stoneham, Massachusetts (the “Stoneham property”). The Stoneham property was purchased on February 5, 1987 by Massbay Land Management Corporation (“Massbay”). The Debtor was the president of Massbay, but his father, Rosario Schifano, was the record sole shareholder. Metropolitan Bank issued a mortgage on the property for $193,000, signed by the Debtor personally and as President of Massbay, and by Rosario as treasurer of Massbay. In 1990, Massbay borrowed $60,000 from Joseph Pascuccio, and backed the loan with a note on the Stoneham property. In June of 1990, Metropolitan Bank initiated foreclosure proceedings on the first mortgage, but sold the mortgage to Pascuccio, leaving Pascuc-cio holding the mortgage note on the Stoneham property for a total of approximately $257,000. The Razzabonis offered in evidence an appraisal of the property in 1997, which valued the property at $350,000.
 

 Massbay dissolved in December of 1990, apparently transferring the Stoneham property to Rosario as Massbay’s sole shareholder, even though the Debtor continued to live in the property. Rosario died in 1993, leaving all of his assets to his wife, Norma Schifano, who is the Debtor’s
 
 *65
 
 mother.
 
 [1]
 
 The Debtor explained that he pays his mother $2,500 per month as rent to live in the Stoneham property. The rental amount is exactly equivalent to the monthly mortgage payment that is due to Pascuccio. Pascuccio has testified that since he has held the mortgage on the Stoneham property, he has received mortgage payments from Rosario, Norma, and from the Debtor. Even though the Debtor maintains personal liability on the mortgage for the Stoneham property and lives in the property, he claims that he has no ownership interest in it because the title to the property originally was held by Mass-bay, then transferred to Rosario, and finally transferred to Norma.
 

 C. Gifts and Loans
 

 The Debtor testified that over the course of several years preceding his filing for bankruptcy, he received over $50,000 from family members, including his parents, brothers and cousins. The Debtor describes these payments as loans and gifts, although he maintains no records of them, and has no bank account statements to verify the transactions or amounts. .
 

 II.
 

 In January of
 
 1995,
 
 the Razzabonis obtained a default judgment against the Debtor and attempted to collect on the judgment. The Debtor filed his petition for personal bankruptcy under Chapter 7 on March 29, 1996. On July 1, 1996, the Razzabonis filed objections to the discharge of the debt owed them. They alleged that the Debtor made a false oath by failing to list material assets and liabilities in his bankruptcy filing in violation of 11 U.S.C. § 727(a)(4), and transferred or concealed property within one year of filing the petition, thereby justifying an exclusion of discharge under 11 U.S.C. § 727(a)(2)(A). Although the original complaint was limited to these two claims, the Razzabonis also argued in the court proceedings that the debt should not be discharged because the Debtor failed to keep adequate records of his financial dealings under 11 U.S.C. § 727(a)(3).
 
 [2]
 

 On January 21, 1998, the Debtor filed a motion for summary judgment, alleging that there was no evidence of fraudulent transfers or false oaths to support the Razzaboni’s objections to the discharge of their debt. The bankruptcy court held a hearing on the motion on March 11, 1998, and issued an oral order granting summary judgment for the Debtor. The bankruptcy court also found the Razzabonis’ objection to be completely meritless and awarded sanctions against the Razzabonis in the amount of the Debtor’s attorneys’ fees. The Razzabonis appealed to the BAP on March 20, 1998. For the next five and a half years, the case moved back and forth between the BAP, the bankruptcy court, and the First Circuit regarding a procedural issue involving a potential set
 
 *66
 
 tlement. Finally, after a settlement was determined to be impossible, the BAP considered the appeal on the merits. On September 26, 2003, the BAP affirmed the bankruptcy court’s order of summary judgment for the Debtor. The BAP concluded that the Razzabonis failed to produce sufficient evidence on all three claims, thereby upholding the discharge of the debt owed to the Razzabonis. The BAP did not address the issue of sanctions levied against the Razzabonis. This appeal followed.
 

 III.
 

 The BAP obtained appellate jurisdiction over the original appeal in this case under 28 U.S.C. § 158(b). This court maintains jurisdiction over this matter as an appeal from a final decision of the BAP under 28 U.S.C. § 158(d).
 

 In reviewing the bankruptcy court’s decision granting summary judgment, we apply the same
 
 de novo
 
 standard of review as the intermediate appellate tribunal, and we owe no particular deference to the conclusions of the BAP.
 
 McCrory v. Spigel (In re
 
 Spigel), 260 F.3d 27, 81 (1st Cir.2001) (quoting
 
 In re Health-co Int’l, Inc.,
 
 132 F.3d 104, 107 (1st Cir.1997)). Fed.R.Bankr.P. 7056 incorporates Fed.R.CivP. 56(c) as the appropriate standard for deciding a motion for summary judgment. Thus, the moving party (the Debtor) bears the initial burden to demonstrate that “there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c);
 
 Celotex Corp. v. Catrett, 477
 
 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the initial burden is met, the burden shifts to the non-moving party (the Razzabonis) to show that genuine issues of material fact exist.
 
 FDIC v. Municipality of Ponce,
 
 904 F.2d 740, 742 (1st Cir.1990). The non-moving party must show more than conclusory allegations, improbable inferences or unsupported speculation to establish genuine issues of material fact. Competent evidence is required.
 
 Medina-Munoz v. R.J. Reynolds Tobacco Co.,
 
 896 F.2d 5, 8 (1st Cir.1990).
 

 IV.
 

 Section 727(a) of the Bankruptcy Code enumerates conduct that can preclude a Chapter
 
 1
 
 debtor’s discharge in bankruptcy. The Razzabonis invoked §§ 727(a)(2)(A), 727(a)(4)(A) and 727(a)(3) to challenge the Debtor’s discharge.
 

 “Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code’s fresh start policy.”
 
 Palmacci v. Umpierrez (In re Umpier
 
 rez), 121 F.3d 781, 786 (1st Cir.1997) (citation omitted). However, “we have noted that the very purpose of certain sections of the law, like [§ 727(a)(2)], is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs.”
 
 Id.
 
 (internal quotation marks omitted).
 

 A. Transfer or Concealment of Assets
 

 Section 727(a)(2)(A) of the Bankruptcy Code states that a court will not discharge a debt if “the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed ... property of the debt- or, within one year before the date of the filing of the petition.” The elements that must be proved to avoid discharge under this provision are (1) a transfer or concealment of property, (2) belonging to the debtor, (3) within one year of filing a petition for bankruptcy, and (4) with the actual
 
 *67
 
 intent to hinder, delay or defraud the creditor.
 
 In re Hayes,
 
 229 B.R. 253, 259 (1st Cir.BAP1999).
 

 The bankruptcy court and the BAP found that the Razzabonis failed to produce sufficient evidence creating a material issue of fact regarding the Debtor’s transfer or concealment of assets one year prior to filing for bankruptcy. We agree.
 

 First, regarding the Northlantic assets, the Razzabonis could point to no specific evidence that the Debtor maintains an interest in the company because all of the company stock is owned by the Debtor’s brother, Joseph. The Razzabonis speculate that the Debtor and his brother shifted assets away from the Debtor and Royal Crest to shield those assets from the creditors. In fact, the Debtor’s wife and brother both admitted in depositions that Northlantic was created to escape the hassle from the creditors. However, there is a complete lack of evidence showing any transfer of assets from the Debtor to Northlantic. Thus, the Debtor’s interest in Northlantic remains “unsupported speculation,” which is insufficient to defeat a motion for summary judgment.
 
 Medina-Munoz,
 
 896 F.2d at 8.
 

 With regard to the Stoneham property, the Razzabonis argue that there are “badges” of ownership indicating that the Debtor actually maintained an ownership interest in it. For example, the Debtor and his family resided in the property, paid the mortgage on the property, filed property damage insurance claims on the property, and claimed a homestead exemption for the property in the bankruptcy filings. But, there is no evidence showing that any transfers or concealment occurred in the year prior to the bankruptcy filing. The Stoneham property was purchased in 1987, and the Debtor began living in the property at that time. Since the property was purchased, it was technically owned by Massbay, then transferred to Rosario, and then transferred to Norma at Rosario’s death. Although the Debtor was a signatory on the original mortgage, he never retained any title of record to the property. Even if there were a plausible argument that some form of economic interest in the property should be attributed to the Debtor, that interest did not accrue in the year preceding the bankruptcy filing. Thus, there are no facts alleged that could reasonably prove that the Debtor concealed his interest in the Stoneham property during the year prior to the bankruptcy filing. Summary judgment, therefore, is appropriate on this claim.
 

 Finally, as to the gifts and loans, the Debtor argues that most of the money he received from family members was given more than one year prior to the bankruptcy. The BAP found that there was no evidence that these “loans” were anything more than handouts from family members to help the Debtor through a difficult financial period. The Razzabonis point to no reliable evidence to establish that the Debtor transferred or concealed assets derived from these loans during the year prior to filing for bankruptcy. Thus, summary judgment was appropriate.
 

 B. False Oath or Account
 

 Section 727(a)(4) of the Bankruptcy Code states that a court will not discharge a debt if “the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account.” The elements that must be proved to avoid discharge under this provision are (1) the debtor knowingly and fraudulently made a false oath, and (2) the false oath related to a material fact in connection to the bankruptcy case.
 
 See e.g., Boroff v. fully (In re
 
 fully), 818 F.2d 106, 110 (1st Cir.1987).
 

 
 *68
 
 As presented in this case, there is significant overlap between the claim that the Debtor transferred or concealed assets, and the claim that he made false oaths regarding those assets. The Razza-bonis point to one specific item that the Debtor failed to disclose in his bankruptcy filings. The Debtor did not disclose his liability related to the mortgage on the Stoneham property, given that he was a signatory on the primary mortgage. When the Razzabonis raised this issue before the bankruptcy court, the Debtor immediately acknowledged his oversight and disclosed the liability. Similarly, Mass-bay’s corporate tax return for 1995 showed that the Debtor was the owner of the company’s common stock, but the Debtor explained that this was an accountant’s error, and corrected the record. All other tax returns showed the Debtor’s father, Rosario, as the sole shareholder. The only argument that would support these omissions or misstatements being deemed material or made with knowing and fraudulent intent would be that the Debtor was attempting to avoid disclosure of any information that would tend to show his ownership interest in the Stoneham property. However, because the evidence clearly shows that the title to the property rests with the Debtor’s mother, despite the Debtor’s mortgage liability, we agree with the bankruptcy court that these omissions could not justify denial of the discharge of the debt due to false oaths under § 727(a)(4). We now turn to the serious and important question here pertaining to the failure to maintain records.
 

 C. Failure to Maintain Records
 

 Section 727(a)(3) of the Bankruptcy Code provides that a court will not discharge a debt if “the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debt- or’s financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.” Although this court has not yet squarely addressed the issue raised in § 727(a)(3), our sister circuits have described the standards for disclosure of records under the Act.
 

 It is a question in each instance of reasonableness in the particular circumstances. Complete disclosure is in every case a condition precedent to the granting of discharge, and if such a disclosure is not possible without the keeping of books or records, then the absence of such amounts to that failure to which the act applies.
 

 Meridian Bank v. Alten,
 
 958 F.2d 1226, 1230 (3d Cir.1992) (citing
 
 In re Underhill,
 
 82 F.2d 258, 259-260 (2d Cir.),
 
 cert. denied,
 
 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936)). Therefore, “[wjhile a debtor may justify his failure to keep records in some cases, a discharge may be granted only if the debtor presents an accurate and complete account of his financial affairs.”
 
 Alten,
 
 958 F.2d at 1230.
 

 The BAP described the Debtor and his brother as “uneducated but skilled in general construction.” Because the standard for a claim of failure to maintain records is based on “reasonableness under all the circumstances,” the education and sophistication of the Debtor is relevant. However, there is significant evidence in this case that the Debtor was involved in a number of corporate transactions and business activities that affected his and other persons’ financial affairs, yet oddly remain completely undocumented. For example, the Debtor has been the president of several family owned construction companies over the past 25 years, from which one would expect the Debtor to acquire a sense of responsible business practices. Yet,
 
 *69
 
 when the ownership interest in Royal Crest was transferred from the Debtor’s brother to the Debtor, he maintained no available records of the transaction. Furthermore, the Debtor’s studied failure to maintain a bank account over the years despite his involvement in business operations arguably makes it difficult to ascertain his financial status with regard to his wages, loans, gifts received, and business activities.
 

 First, with regard to the lack of records of ownership in the construction companies, the history in this case is very convoluted. The Debtor has been the operating president of each of the corporations, Massbay, Royal Crest, and Northlantic. He has always maintained a central role, including managing the finances, and has incurred significant debt and liability through these activities, including the $200,000 owed to the Razzabonis. Yet, the Debtor has never been an original shareholder with an ownership interest in the corporations. The only time the Debtor developed an ostensible ownership interest was when his brother Joseph inexplicably transferred ownership of Royal Crest to the Debtor.
 

 The Razzabonis hypothesize that the Debtor actually has an ownership interest in Northlantic, which he failed to disclose in his bankruptcy filings. Under the Raz-zabonis’ theory, the Debtor’s brother, Joseph, “gave” Royal Crest and all of its assets to the Debtor, the Debtor withdrew money from Royal Crest under the guise of “loan repayments,” the Debtor transferred funds to his brother to create Northlantic, and the Debtor now receives his share of the money back from North-lantic through salary and loans. However, because Northlantic’s records show that it is owned by Joseph, the funds that previously belonged to Royal Crest and the Debtor are now shielded from the creditors.
 

 The facts of this case, as conceded by the Debtor, create some inference that there may have been concealment or transfer of assets from Royal Crest to Northlantic via the Debtor, as the Razza-bonis allege. However, as we stated above, this inference is not supported by sufficient evidence to avoid summary judgment on the § 727(a)(2)(A) claim. Yet, the lack of evidence may be attributed to the Debtor’s failure to maintain any corporate records of his receipt or purchase of Royal Crest, or any other subsequent dealings involving the transfer of business from Royal Crest to Northlantic. At his deposition, the Debtor’s brother Joseph testified that although he was the owner of Royal Crest, the Debtor took care of all financial matters; Joseph did not even know which bank held the company’s accounts. A reasonable inference could be drawn that the Debtor’s claim that he has no financial records from the transaction transferring all of the stock of Royal Crest is not plausible. At the very least, the Razza-bonis have met their burden to survive summary judgment on this claim.
 

 Although the Bankruptcy Code does not “require an impeccable system of bookkeeping,” the records must “sufficiently identify the transactions [so] that intelligent inquiry can be made of them.”
 
 Alten,
 
 958 F.2d at 1230 (quoting
 
 In re Decker,
 
 595 F.2d 185, 187 (3d Cir.1979)). We hold that there is a material issue of fact regarding whether the Debtor kept sufficient records for the court to determine his financial status. We will reverse the BAP on this claim and direct that it remand for trial to determine if the Debt- or’s failure to maintain records of his financial and business activities, especially as to Royal Crest and Northlantic transactions, unreasonably prevented the court
 
 *70
 
 and the parties from ascertaining a complete and accurate picture of the Debtor’s financial affairs. If the Debtor’s failure to maintain these records was unreasonable, then discharge may be avoided under 11 U.S.C. § 727(a)(3).
 
 [3]
 

 Similarly, other circuits have considered whether a debtor’s failure to maintain a bank account for the purpose of avoiding a levy from the IRS constitutes an unreasonable failure to maintain records. In
 
 Alten,
 
 an attorney did not maintain a bank account and operated exclusively on a cash basis for approximately six years before filing a petition for bankruptcy. 958 F.2d at 1228. The court found that the lack of personal accounting records made it impossible for the court to determine his financial condition.
 
 Id.
 
 at 1234. Furthermore, the court found that under section 727(a)(3), once a creditor established that the debtor failed to keep adequate records, the burden switched to the debtor to show that failure to maintain adequate records was justified under the circumstances.
 
 Id.
 
 “Fear of liens by creditors [including the IRS] can never by itself constitute adequate justification for failing to candidly disclose the financial status of a debtor.”
 
 Id.
 

 Under § 727(a)(3), a creditor need not prove a fraudulent intent, but only that the debtor unreasonably failed to maintain sufficient records to adequately ascertain his financial situation.
 
 Alten,
 
 958 F.2d at 1234. Because the Debtor has for the most part maintained no ownership interest in the various family construction companies, it seems that his income and assets have been based exclusively in wages plus loans and gifts from family members. There is a material issue of fact regarding whether the Debtor’s failure to maintain bank records has made it impossible for the court to ascertain whether these wages, loans and gifts are assets that are part and parcel of the bankruptcy estate. Although not a per se rule, in this case the failure to maintain a bank account by an individual involved in many transactions of extensive character raises serious doubt about the truthfulness of the Debtor’s purported financial status, which has not yet been sufficiently explored. Therefore, summary judgment was inappropriate on this issue, and the BAP will be reversed.
 

 V.
 

 For the reasons set forth above, the BAP’s decision affirming the bankruptcy court’s grant of summary judgment is affirmed as to the claims brought under 11 U.S.C. §§ 727(a)(2)(A) and (a)(4), and reversed as to the claim brought under § 727(a)(3). The claim for discharge under § 727(a)(3) will be remanded to the bankruptcy court for trial on the merits. Consequently, we also reverse the bankruptcy court’s award of sanctions against the Razzabonis, as we hold that then-claims were not baseless. Each party is to bear its own cost.
 

 [1]
 

 . The Debtor produced a will from his father's estate bequeathing all real and personal property to his wife, Norma Schifano. The record shows that the will was never probated, but nothing in the record shows that title to the Stoneham Property passed to anyone other than Norma Schifano.
 

 [2]
 

 . The BAP noted that the Razzabonis did not raise allegations under § 727(a)(3) in their complaint. However, both parties addressed § 727(a)(3) in the pre-trial report, and the bankruptcy court addressed this issue on summary judgment. Under Fed.R.Civ.P. 15(b), made applicable in a bankruptcy proceeding under Fed.R.Bankr.P. 7015, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.” Therefore, the BAP appropriately considered the § 727(a)(3) claim on appeal, and we also will review this claim.
 

 [3]
 

 . At trial before the bankruptcy court, the inquiry may include several relevant factors such as “the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debt- or's business; the amount of credit extended to the debtor or his business; and any other circumstances that should be considered in the interest of justice.”
 
 Alten,
 
 958 F.2d at 1231 (quoting
 
 In re Wilson,
 
 33 B.R. 689, 692 (Bankr.M.D.Ga.1983)).