**In re Jimmy and Carol KELLER.**

**Grisham Farm Products, Inc., Plaintiff,**

**v.**

**Jimmy D. Keller, Defendant.**

**Bankruptcy No. 4:03–BK–16095M.**
**Adversary No. 4:03–AP–1319.**

United States Bankruptcy Court,
E.D. Arkansas,
Western Division.

Feb. 18, 2005.

---

Jesse W. Thompson, Thompson Law Office, Conway, AR, for Debtors.

### MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On May 21, 2003, Jimmy D. Keller and Carol Keller filed a voluntary petition for relief under the provisions of Chapter 7 of the United States Bankruptcy Code. M. Randy Rice, Esq., was appointed Trustee.

On October 16, 2003, Grisham Farm Products, Inc. ("Grisham") filed a complaint objecting to the discharge of Jimmy D. Keller ("Debtor") and the dischargeability of the debt owed to Grisham. Grisham objected to the Debtor's general discharge pursuant to 11 U.S.C. § 727(a)(3) (failure to keep or preserve records concerning the debtor's financial condition and business transactions) and 11 U.S.C. § 727(a)(5) (failure to explain deficiency of assets to meet liabilities).

A trial was held in Little Rock, Arkansas, on August 6, 2004, on the complaint, and at the conclusion of the trial the Court ruled in the Debtor's favor on all of the allegations except the allegation concerning the Debtor's failure to keep and preserve adequate records as required by 11 U.S.C. § 727(a)(3). This issue was taken under advisement, and both parties have submitted briefs.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J)(2000), and the Court has jurisdiction to enter a final judgment in this case. The following shall constitute the Court's findings of fact and conclusions of

law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## DISCUSSION

The Debtor was engaged in raising cattle in an arrangement he described as a "stocker operation," which was located between Heber Springs and Greers Ferry, Arkansas, near State Highway 16. (Tr. at 17.) He testified, "We bought feeder cattle that were preconditioned . . . meaning we'd give them all their shots, get them over shipping fever and sickness and get them where they'd eat. They'd come in from pasture and off the mama, and we'd more or less teach them to eat and get them gaining weight." (Tr. at 17.) The Debtor would also brand, deworm, and tag the cattle.

The cattle were purchased by the Debtor and would later be resold to a third party referred to by the Debtor as "the Gabels,"[1] with whom he dealt pursuant to an oral contract. The Debtor stated he also infrequently sold cattle to someone other than the Gabels. Typically the Debtor purchased the cattle, and after about a week, he would invoice the Gabels for the cattle. However, he retained the cattle while they were being conditioned for the feed lot, a process that lasted from 90 to 120 days.

After the preconditioning, the Gables would pick up the cattle and pay the Debtor a processing fee for the various preconditioning services and certain out-of-pocket expenses. The Debtor would also earn an additional fee based on weight gain of the cattle while in the Debtor's possession at a rate of $0.50 per pound gained. (Tr. at 22.) Part of the agreement with the Gabels concerned a death rate allowance. Up to 3 percent of the cattle purchased that died would be paid for by the Gabels, while the expense for the death rate over 3 percent was to be absorbed by the Debtor. In the period before the bankruptcy case was filed, the Debtor testified his death loss rate was 10 to 15 percent. (Tr. at 19.)

The Debtor's volume of cattle bought and sold to the Gabels was "400 to 500 head a month." (Tr. 22.) The Debtor stated he spent $45,000.00 to $50,000.00 a week purchasing cattle. In the year 2001, the Debtor purchased $3.7 million worth of cattle.

Prior to November 2002, the Debtor maintained his business account at First State Bank in Conway. In November 2002, he opened another account at Heber Springs State Bank and transacted his business through the new account. The Debtor changed banks because First State Bank stopped allowing the Debtor overdraft privileges.

The Debtor stated that he would sometimes be overdrawn at First State Bank by as much as $300,000.00 "because the Gabels were slow about paying." (Tr. at 33.) The bank statement for the account at First State Bank for the period ending October 31, 2002, showed an ending negative balance of $6,369.23 with the negative balance reaching a high on October 16, 2002, of $106,137.70. The bank charged overdraft fees or insufficient funds fees of $950.00 for the month ending October 31, 2002. However, the bank at Heber Springs would not permit the Debtor to overdraw his account and would return checks if there were not sufficient funds in the account to cover the checks.

In late 2002, the Debtor became involved in a dispute with the Gabels over the excessive death rate of cattle and a claim by the Gables that several branded

---

1.  James Gables and family operate a feed lot or lots in Texas. (Pl.'s Ex. 5 at 2.) For the sake of clarity, the Court will refer to their operation as "the Gabels."

head of cattle invoiced to the Gables and paid for were missing. The testimony by the Debtor about all of these events both at trial and at the first meeting of creditors was disjointed and confusing.[2]

Ultimately, the Debtor discontinued his business with the Gabels and was forced to file bankruptcy. The Debtor pleaded guilty to a Class A Misdemeanor of theft of property in the Circuit Court of Sharp County, Arkansas, on April 7, 2003. He testified he served 14 days in jail, although the record is not clear for what charge.[3]

According to the Debtor's testimony, upon his release from jail, he found his cattle business in shambles and his business records in disarray.

The Debtor testified that he filed federal tax returns for 2001 and 2002, and that he prepared the returns himself from the records he kept. He calculated gross receipts from bank deposits and expenses from checks and receipts. He also calculated depreciation on his equipment. The Trustee testified that the Debtor did turn over records to him, including his tax returns,

2. At the Debtor's First Meeting of Creditors, the Debtor testified as follows:

Mr. Keller: Approximately ... according to my records, they owed me for four (4) loads, but uh, what had happened, it had started further back in December, and then when they turned in the inventory, at that time, showed that they still owed me for 100 head. That was December the 11th, and uh, we had a discrepancy on inventory, and of course, we had a large death loss. We had a new disease called microplasm and uh, our death losses were large, and I started in August to tell them we having problems with help and we stopped buying for them for three weeks and that upset them and so they said well, if I couldn't do it, they'd get somebody that would. And so we went back to buying cattle; our death losses still continued, and uh, we got to November and there was a discrepancy in what I said the inventory was and what they said it was. So I made trips to Texas and then just prior to Christmas, they came out here and we had thought we had it all resolved. We were going to get the bills paid and feed bills. Of course, the cat ... not the cattle wasn't all they owed me for. They owed me for seven to eight weeks of feed bills, which was running between $400 and about $500 a week. And uh, they owed me for all that, and uh, our standard practice ... have I answered your question yet?
Mr. Gershner: No.
Mr. Keller: I'll stop.
Mr. Rice: What a ... who is this person and what was his entity again?
Mr. Gershner: James Gabel. What was the value of the cattle they picked up from you in November and December of last year?

Mr. Keller: Uh, about 90 head a load, approximately.
Mr. Gershner: They picked up four loads with 90 ...
Mr. Keller: Three loads.
Mr. Gershner: Three loads with 90 head a load?
Mr. Keller: And uh, that would just be about $350.00 a head, $360 a head, uh, about what they's averaging.
Mr. Gershner: So do they owe you $350 a head for those?
Mr. Keller: Well, to finish the story was when they come in, they said I was short of inventory—I owed them cattle instead of them owing me. And of course, at the time of that morning when they got there, well everything was fine. They didn't have any problems with me at all. Well at 2:00, they flew their lawyer in on their Leer jet, they went to Amarillo and picked up their lawyer and uh, then they went to accusing me on Thursday in the Heber Springs paper. They was offering a $5,000.00 reward leading to anybody that would offer evidence that I ... that cattle had been taken. They stopped this short of accusing me in the paper that I had taken the cattle. And uh, you know, there wasn't any cattle taken. All the cattle moved from that place were moved on their turf. (Pl.'s Ex. 5 at 3–4.)

3. Plaintiff's Exhibit 10 is the Order of the Circuit Court of Sharp County which sentenced the Debtor to pay restitution of $19,000.00 and a $1,000.00 fine and 30 days in jail if the restitution was not paid.

but that the records were not sufficient for the Trustee to determine whether his farm expenses and farm income were accurate.

Acknowledging that he paid $3.7 million for cattle he purchased in 2001, the Debtor said he kept his operating costs in files. His payroll records consisted only of cancelled checks because he considered his employees "day workers" and did not pay withholding taxes to the government. The Debtor conceded that sometimes he would not deposit checks he received from the sale of cattle into his bank account, but would endorse the check over to "the sale barn" in payment of a debt he owed. (Pl.'s Ex. 5 at 63.) He said he did not maintain written records of these types of transactions. At trial, he testified he had only done this twice.

The Debtor also acknowledged that the deposits made to the Heber Springs account and his personal account at Regions do not indicate the source of the funds, and he has no records of the source of the deposits.

The Debtor testified at trial and at the first meeting of creditors regarding his records and record keeping. He did not maintain a check register, general ledger, accounts payable ledger or accounts receivable journal. His explanation of his record keeping at trial was as follows:

> We had just a very simple system, a pigeon-hole system or whatever you want to call it. We had a box type file, and all the cattle receipts that came in that were not paid for went into this file. Then as we processed the cattle, we would work the invoices and work the cattle off there that had been branded. Then we'd move them to the file that we invoiced for, and that's how we did it.

> Q. Did that system work for you for two and-a-half to three years?

> A. It worked quite well. You could just look at that box and you knew what your receipts were and what cattle you had bought they hadn't paid for immediately.

> Q. Was the way you kept your records the reason that your business failed?

> A. No.

> . . .

> Q. What did they do—you went to jail for 14 days?

> A. That's correct.

> Q. During that period of time, whatever record-keeping system you had, did you have it anymore after that?

> A. It was non-existent after that.

> Q. Where were these records maintained?

> A. They were maintained in the office at the farm.

> Q. All right. Describe what you found when you came back after the 14 days in jail.

> A. Not only were the doors open to the office, all the gates were open on the farm. I'm surprised that any cattle were still there. Feed bunks were carried off and the tractor gone. Some of the cattle were gone. It was a mess.

> Q. Were the paper records you had in there in disarray, as well, or were they all intact?

> A. No, not at all. Cattle had been in there and crapped in the floor. Stuff was pawed and thrown, and they were not all there.

> Q. Now, was that anything that you caused to happen?

> A. Definitely not.

(Tr. at 46–49.)

The Debtor testified at the first meeting regarding his records and record keeping as follows:

Mr. Gershner: Does anybody owe you money for . . .?

Mr. Keller: I wish.

Mr. Gershner: Does that mean no they don't? Other than perhaps Mr. uh . . .

Mr. Keller: Gabel.

Mr. Gershner: Gabel.

Mr. Keller: You know does he or doesn't he, you know we're short so many head of cattle, so I don't know whether he owes me or not.

Mr. Gershner: And how would any other determine whether he owes you, are there any records, bank accounts, invoices, anything that Mr. Rice could examine to determine whether James Gabel owes you money?

Mr. Keller: I've given him all my records.

Mr. Gershner: Okay, you're not answering my question. From . . . have you given him records from which he could examine and determine whether James Gabel owes you money?

Mr. Keller: Well, it would be according to whether you could decipher it or not, but I give him all . . . all I had.

Mr. Gershner: Could you examine those records and come up with an opinion to that examination of whether Mr. Gabel owes you money?

Mr. Keller: Well, a similar thing happened to me in 2001. A discrepancy over inventory with the Gabels and I settled it. My records were better in 2001, 2002. This thing had come up—I went out there, they come back here and I made two trips out there. No, I couldn't decipher the discrepancy myself with my records, and that's the reason we wound up where we are.

( Pl's Ex. 5 at 32–33.)

## ARGUMENTS

■ Grisham argues in its post-trial brief that the proof establishes that the Debtor failed to keep and preserve sufficient records from which his financial affairs could be ascertained. The Debtor argues in his brief that he kept appropriate records under these circumstances, considering the important fact that the Debtor is a cattle farmer. He points out that he had sufficient business records to file unchallenged tax returns. He also states that his incarceration resulted in lost or destroyed records, a circumstance beyond his control.

■ Although the Bankruptcy Code does not require an impeccable system of bookkeeping, "the records must 'sufficiently identify the transactions [so] that intelligent inquiry can be made of them.'" *Razzaboni v. Schifano (In re Schifano)*, 378 F.3d 60, 69 (1st Cir.2004)(quoting *In re Alten*, 958 F.2d at 1230); *Meridian Bank v. Alten (In re Alten)*, 958 F.2d 1226, 1230 (3d Cir.1992) (quoting *In re Decker*, 595 F.2d 185, 187 (3d Cir.1979)).

■ With regard to burden of proof under section 727(a)(3), the objecting party must make an initial showing that the debtor failed to maintain and preserve adequate records and that the failure makes it impossible to ascertain the debtor's financial condition and material business transactions. *In re Alten*, 958 F.2d at 1233 (citing *In re Decker*, 595 F.2d at 187 (3d Cir.1970)). *See also Aid Auto Stores, Inc. v. Pimpinella (In re Pimpinella)*, 133 B.R. 694, 698 (Bankr.E.D.N.Y.1991) (burden of proof of inadequacy of records rests with objectant).

■ If the debtor breaches his duty to his creditors to keep adequate records, he is given the opportunity to provide some justification for the breach. *In re Pimpinella*, 133 B.R. at 698 (citing *In re Moran-*

*do,* 116 B.R. 14, 15 (Bankr.D.Mass.1990)(citing *Manhattan Leasing Sys., Inc. v. Goblick (In re Goblick),* 93 B.R. 771, 775 (Bankr.M.D.Fla. 1988))). If the debtor cannot justify his failure to keep adequate records, his discharge will be denied.

■ This Bankruptcy Code section ensures that the debtor will disclose to parties in interest his pre-bankruptcy financial condition. *In re Pimpinella,* 133 B.R. at 697 (section entitles trustee to information to evaluate financial status of debtor's estate)(citing *Schultz v. Shapiro (In re Shapiro),* 59 B.R., at 844, 848 (Bankr.E.D.N.Y. 1986)); *In re Esposito,* 44 B.R. 817, 826 (Bankr.S.D.N.Y.1984) (section obligates debtor to supply information sufficient to trace its financial history).

The evidence establishes by a preponderance of the evidence that the Debtor did not keep adequate records, especially considering the scope of his operation, which in 2001 involved the purchase and sale of cattle worth around $3.7 million. The Debtor obviously failed to keep adequate bank records such as a check register and deposit slips or other records showing the source of funds. He was frequently overdrawn at the bank, resulting in significant negative balances in his checking account. One inference the Court draws from this fact is that the Debtor never knew, from day to day, whether he was making or losing money. The Debtor should have realized that his system of pigeon-holing invoices was not an effective means of accounting and record keeping.

Most significantly, the Debtor had no records to establish whether the Gabels were indebted to him on the date the petition was filed. He kept no general ledger, no accounts receivable or accounts payable journal and had only a partial record of the number of cows that died while in his possession.

The Trustee testified that the records were inadequate to determine the Debtor's financial condition. The Debtor admitted as much at the first meeting when he stated, "No, I couldn't decipher the discrepancy [between what the Gabels claimed was owed them and what the Debtor believed he was owed by the Gabels] with my records, and that's the reason we wound up where we are." (Pl.'s Ex. 5 at 33.)

The Debtor's failure to keep records is not justified because he is a farmer. He could have and should have hired an accountant or a bookkeeper to keep up with a business that involved millions of dollars a year in transactions, including the weekly purchase of $50,000.00 worth of cattle.

Therefore, for these reasons, the Debtor's discharge is denied.

IT IS SO ORDERED.