In re OLYMPIC MILLS CORPORATION d/b/a Olympic Group, and Coachman Incorporated, Debtors.

Luis Rivera Siaca, Enery Ortiz–Rivera, and Conjugal Partnership, Defendants/Appellants,

v.

DCC Operating, Inc., Plaintiff/Appellee.

BAP No. 04–047.
Bankruptcy Nos. 01–13021–GAC, 01–13028–GAC.
Adversary No. 03–0090–MWV.

United States Bankruptcy Appellate Panel of the First Circuit.

Dec. 1, 2005.

Jaime Sifre Rodríguez, San Juan, PR, on brief for Defendants/Appellants.

W. Steven Paleos, Eric A. Tulla, Carmen D. Conde, Heto Rey, PR, on brief for Plaintiff/Appellee.

Before VOTOLATO, HAINES and ROSENTHAL, U.S. Bankruptcy Appellate Panel Judges.

ROSENTHAL and HAINES, Bankruptcy Judges.

This case involves an appeal from the bankruptcy court's order granting partial summary judgment in favor of the Plaintiff/Appellee, DCC Operating, Inc., and against the Defendant/ Appellant, Luis Rivera Siaca ("Rivera"),[1] for breach of a subordination agreement, and all prior interlocutory orders that merge with that order, including certain orders issued by the U.S. District Court for the District of Puerto Rico before the case was transferred to the bankruptcy court. The bankruptcy court certified finality under Fed. R.Civ.P. 54(b). This Panel issued an Order to Show Cause raising the question of whether the Panel has jurisdiction to consider these appeals which seek review of certain district court orders. After extensive briefing, the Panel issued an order "without rendering a final decision on the Panel's jurisdiction over this appeal, we hereby find that the appellants have shown sufficient cause to preclude dismissal of this appeal."

For the reasons set forth below, we AFFIRM.

## BACKGROUND

The Plaintiff/ Appellee, DCC Operating, Inc. ("DCC"), is the general partner of Development Capital Ventures ("DCV"), a Delaware limited partnership, which provides venture capital to small businesses. Rivera is the chairman and chief executive officer of Coachman, Inc. ("Coachman") and its affiliates, including Olympic Mills Corporation ("Olympic Mills"). Coachman and Olympic Mills are Delaware corporations doing business in Puerto Rico and Rivera is a Puerto Rico resident.

This case involves a $2.5 million bridge loan which was made by DCV to Coachman for the creation of a Coachman subsidiary. As a condition precedent to the extension of the $2.5 million loan, DCV, Rivera and Coachman entered into a "Subordination and Standby Agreement" on February 24, 2000 ("Subordination Agreement"), which required Rivera to defer collection of all payments of principal on loans which he made to Coachman and its affiliates until DCV was first paid in full. The agreement also required Rivera to hold in trust any payments received on account of any subordinated debt. In connection with the Subordination Agreement,

---

1. Rivera's wife and their conjugal partnership are also defendants/appellants. In the interest of conciseness, we refer to them collectively as "Rivera."

Coachman executed a "Convertible Subordinated Demand Note" in favor of DCV, and DCV agreed to lend $2 million to Coachman subject to the terms and conditions of the Subordination Agreement. The amount of the loan was subsequently increased to $2.5 million upon the amendment of the Note on November 21, 2000. The loan fell into default in February, 2001.

At the time of the Subordination Agreement, Rivera was also lending money to Coachman and its affiliates. On January 5, 2000 (prior to the execution of the Subordination Agreement), Rivera loaned $4 million to Coachman and its affiliates. Subsequent to the signing, Rivera made a series of loans to Coachman and its affiliates totaling $16.6 million. Between the signing of the Subordination Agreement, and October 18, 2001, Coachman and its subsidiaries repaid Rivera at least $5.6 million.

In November, 2001, DCC filed a complaint in the U.S. District Court for the District of Puerto Rico alleging several claims against Rivera. Shortly thereafter, on November 26, 2001, Coachman and Olympic Mills filed Chapter 11 bankruptcy petitions in the U.S. Bankruptcy Court for the District of Puerto Rico ("bankruptcy court").

The core issue in the district court proceeding was which of Coachman's debts to Rivera were required to be subordinated pursuant to the Subordination Agreement. DCC alleged that DCV was entitled to priority over Rivera in receiving any loan payments from Coachman and, therefore, that the payments made to Rivera violated the Subordination Agreement. Rivera argued that the Subordination Agreement only applied to the money he leant to Coachman prior to the execution of the Subordination Agreement, that the funds he received from Coachman were pay-

ments on the loans he made subsequent to the signing of the agreement; and, therefore, that those payments were not subject to subordination.

On December 16, 2002, the district court issued an Opinion and Order granting partial summary judgment in favor of DCC, holding that *all* loans made by Rivera to Coachman were subordinated and that Coachman's repayments to Rivera violated the Subordination Agreement. *See DCC Operating, Inc. v. Rivera Siaca, et al.*, Civil No. 01–2524(HL), Doc. 56. The district court further ordered that it was leaving "the issue of the precise amount of liability to the parties to be resolved either at the pretrial or settlement conference or by stipulation. If the parties are unable to resolve this remaining issue without the Court's intervention, the Court will proceed to address DCC's request on this matter." *See id.* On December 26, 2002, Rivera filed a motion for reconsideration of the Opinion and Order. On that same day, Rivera filed a motion to dismiss or stay due to the absence of allegedly non-diverse indispensable parties, DCV and Coachman. DCC opposed both motions.

On December 27, 2002, Coachman and Olympic Mills, claiming an interest in the funds paid to Rivera, filed a motion to intervene in the district court case, and requesting that the case be referred to the bankruptcy court. On December 31, 2002, the district court granted the motion to intervene, and on May 1, 2003, entered an order referring the case to Chief Judge Gerardo A. Carlo of the U.S. Bankruptcy Court for the District of Puerto Rico. On that same date, the district court also entered an order denying Rivera's motion for reconsideration. Thereafter, the action was opened as an adversary proceeding in the bankruptcy court (Adv.Pro. No. 03–

090).[2]

On November 4, 2003, DCC filed a motion for summary judgment with the bankruptcy court, seeking a determination of the precise amount of liability based upon the district court's judgment. Thereafter, Rivera filed a motion to set aside or vacate the partial summary judgment entered by the district court and/or to dismiss the amended complaint for lack of non-diverse indispensable parties. In the motion, Rivera argued that the partial summary judgment should be set aside since the action was filed and summary judgment had entered without the joinder of Coachman and Olympic Mills, who were non-diverse indispensable parties. Rivera also filed an opposition to DCC's summary judgment motion and a cross motion for summary judgment seeking dismissal with prejudice.

On January 21, 2004, the bankruptcy court heard oral argument on the cross motions for summary judgment, and took the matters under advisement. On August 18, 2004, the bankruptcy court entered an order and an accompanying memorandum opinion granting partial summary judgment in favor of DCC. The order, as amended on August 26th, provided:

1. The Plaintiff's motion for summary judgment is granted;

2. Defendant Rivera's cross motion for summary judgment is denied;

3. The Plaintiff is awarded damages in the amount of $2,363,500 in principal, $1,160,038.51 in interest through the date of judgment, and 12% per annum post judgment interest on any uncollected amount until paid.

4. The issue of attorney's fees and costs are deferred until such time as the full amount can be ascertained.

The bankruptcy court noted in its accompanying memorandum opinion that it would not set aside the district court's judgment on liability and that it agreed with the district court's analysis and conclusion. On August 25, 2004, the parties filed separate motions seeking certification of the summary judgment order as final pursuant to Bankruptcy Rule 7054(a) and Fed.R.Civ.P. 54(b), and entry of a final partial judgment.

On August 26, 2004, Rivera filed a notice of appeal from the summary judgment order and from "all prior interlocutory orders that merge with the [summary judgment] final order." On September 2, 2004, the bankruptcy court issued an Order Certifying This Court's August 26, 2004 Order As Final Judgment Pursuant to Fed. R.Civ.P. 54(b). On that same date, the bankruptcy court also issued a Partial Final Judgment. Thereafter, Rivera filed an amended notice of appeal referencing the bankruptcy court's "Partial Final Judgment" in its appeal.

In October, 2004, the Panel issued an order to Rivera to show cause regarding the Panel's jurisdiction over these appeals. Rivera responded by filing a "Motion Showing Cause." Thereafter, the Panel issued an order stating that Rivera had shown sufficient cause to preclude dismissal of the appeal, but specifically reserving the right to render a final decision on jurisdiction.

### APPELLATE JURISDICTION

Before addressing the merits of this appeal, we must first determine the threshold issue of our appellate jurisdiction. *See* *In re George E. Bumpus, Jr. Constr. Co.*, 226 B.R. 724 (1st Cir. BAP 1998) (bankruptcy appellate panel is duty-bound to

---

**2.** By order dated November 25, 2003, Judge Carlo referred the adversary proceeding to the Honorable Mark W. Vaughn, sitting in Puerto Rico by designation.

determine its jurisdiction before proceeding to the merits even if not raised by the litigants).

■ A bankruptcy appellate panel may hear appeals from "final judgments, orders and decrees [pursuant to 28 U.S.C. § 158(a)(1)] or with leave of the court, from interlocutory orders and decrees [pursuant to 28 U.S.C. § 158(a)(3)]." *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998). "A decision is final if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Id.* at 646 (citations omitted). An interlocutory order "'only decides some intervening matter pertaining to the cause, and requires further steps to be taken in order to enable the court to adjudicate the cause on the merits.'" *Id.* (quoting *In re American Colonial Broad. Corp.*, 758 F.2d 794, 801 (1st Cir.1985)).

### A. Bankruptcy Court's Partial Final Judgment

■ It is well settled that an order granting partial summary judgment is not a final judgment, order, or decree, absent "some clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as [the court] is concerned, is the end of the case." *Goodwin v. United States*, 67 F.3d 149, 151 (8th Cir.1995). Federal Rule of Civil Procedure 54(b) permits the entry of final judgment as to fewer than all the parties or all the claims in a multi-party action "upon an express determination that there is no just reason for delay" in entering judgment.[3]

The bankruptcy court made the requisite finding and directed entry of a final judgment notwithstanding that there were certain issues (i.e. attorneys' fees and costs) which remained unadjudicated. As the bankruptcy court certified the partial summary judgment order as final pursuant to Rule 54(b), we have jurisdiction to consider that portion of the appeal.

### B. Interlocutory District Court Orders

■ This case presents an issue of first impression. Most of the issues on appeal are framed as questions of whether the *district court* erred as a matter of law, and revolve around the alleged lack of complete diversity. The district court granted partial summary judgment in favor of DCC and against Rivera (*see DCC Operating, Inc. v. Rivera Siaca, et al.*, Civil No. 01–2524(HL), Doc. 56), and then transferred the case to the bankruptcy court. Rivera did not seek an interlocutory appeal of the district court's partial summary judgment order.

The Panel has jurisdiction under 28 U.S.C. § 158(a) to "hear appeals from ... bankruptcy judges." Here, however, the interlocutory orders were entered by a district judge. The question presented, in its simplest form is, whether the Panel can hear and decide the portion of this appeal relating to interlocutory orders of the district court. The majority of this Panel answers that question in the affirmative for the following reasons.

■ The appealable event that gives rise to the Panel's jurisdiction is the bankruptcy court's Partial Final Judgment dat-

---

3. The rule provides in pertinent part:
 When more than one claim for relief is presented in an action, ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or

parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment....
Fed.R.Civ.P. 54(b).

ed September 2, 2004. The case was transferred by the district court because it involved a core proceeding;[4] therefore, the bankruptcy court had full authority to enter partial final judgment. All prior interlocutory orders, opinions and non-final partial judgments are subject to review along with the appealable judgment. *See Brandt v. Wand Partners*, 242 F.3d 6, 15 (1st Cir.2001) ("[W]here the district court has made interlocutory decisions before entering a final judgment, an appeal from the final judgment brings up the interlocutory decisions for review by this court"); *John's Insulation, Inc. v. L. Addison & Assocs., Inc.*, 156 F.3d 101, 105 (1st Cir.1998) ("[I]t has been uniformly held that a notice of appeal that designates the final judgment encompasses not only that judgment, but also all earlier interlocutory orders that merge in the judgment") (citing cases from other circuits); *see also EEOC v. Union Independiente de la Autoridad de Acueductos*, 279 F.3d 49, 54 (1st Cir.2002) (citing *John's Insulation*); *Picard v. Members of the Employ. Ret. Bd.*, 275 F.3d 139, 144 n. 5 (1st Cir.2001) (same); *Tringali v. Hathaway Mach.*, 796 F.2d 553, 559 (1st Cir. 1986) (entry of a final, appealable order will enable an appellant to request review of earlier nonfinal decisions *upon which the final decision rests).* Thus, an order, even if interlocutory, is nevertheless appealable if it has merged into a subsequent order which, by its nature, is a final, appealable order. *See, e.g., Ben Cooper, Inc. v. Insurance Co. of Pa. (In re Ben Cooper, Inc.)*, 924 F.2d 36, 38 (2d Cir.1991) (finding court had appellate jurisdiction even though withdrawal of reference to bankruptcy court was interlocutory nonappealable order, where abstention decision was appealable, and interlocutory withdrawal order merged into final judgment). This position is consistent with the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr.P. 9021 (incorporating Fed. R.Civ.P. 58 and 54(b)) ("In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of the parties.").

It is important to note that the bankruptcy judge in his memorandum opinion clearly recognized his responsibility to revisit the prior interlocutory orders and he did so.

> In his cross motion for summary judgment, Rivera [Appellant] argues that the partial summary judgment entered by the district court should be vacated and set aside. This Court does not agree. Having carefully reviewed the district court's opinion, this Court agrees with the district court's analysis and conclusion. The Court does not see any reason to compel a different result. Thus, this Court will not set aside the district court's order granting partial summary judgment. Accordingly, Rivera's cross motion for summary judgment is denied.

We are mindful of the unusual situation created by the current state of facts. We recognize, however, the serious issues presented if we do not have jurisdiction. The Appellant could end up in an anomalous position such as existed in *Brandt v. Wand*

---

4. The district court's April 29, 2003 order provided, in pertinent part, as follows: "This case is referred to Chief Judge Gerardo A. Carlo of the U.S. Bankruptcy Court for the District of Puerto Rico, pursuant to 28 U.S.C. § 157(a)."

*Partners, supra,*[5] or be forced to seek an immediate appeal from the district court, or ask the bankruptcy court to make proposed findings and ruling and forward the same to the district court for a final order. We do not believe any of these alternatives present a realistic alternative for an appellant, nor do we believe that Congress intended such a result.

### STANDARD OF REVIEW

■ We evaluate the bankruptcy court's findings of fact pursuant to the "clearly erroneous" standard of review and its conclusions of law *de novo. Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 30 (1st Cir.1994); *see also* Fed. R. Bankr.P. 8013; *Palmacci v. Umpierrez,* 121 F.3d 781, 785 (1st Cir.1997).

■ Federal Rule of Civil Procedure 56 ("Rule 56"), made applicable to bankruptcy proceedings pursuant to Bankruptcy Rule 7056, sets forth the appropriate standard for deciding a motion for summary judgment. Pursuant to this rule, the moving party bears the initial burden of demonstrating that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the initial burden is met, the burden shifts to the non-moving party to show that genuine issues of material fact exist. *See Razzaboni v. Schifano (In re Schifano),* 378 F.3d 60, 66 (1st Cir.2004) (citing *FDIC v. Ponce,* 904 F.2d 740, 742 (1st Cir.1990)). The Court of Appeals for the First Circuit has described the summary judgment practice as follows:

> The movant must put the ball in play, averring "an absence of evidence to support the nonmoving party's case." [...] The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both "genuine" and "material." [...] A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." [...] Put another way, a "genuine" issue exists if there is "sufficient evidence supporting the claimed factual dispute" to require a choice between "the parties" differing versions of the truth at trial. [...] A "material" issue is one that "affects the outcome of the suit," [...] that is, an issue which, perforce, "needs to be resolved before the related legal issues can be decided."

*Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990) (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; other citations omit-

---

**5.** In *Brandt,* the Chapter 7 trustee brought an adversary proceeding on behalf of the estate. The bankruptcy court subsequently dismissed several fraudulent transfer counts contained in the complaint, denied the trustee's request for leave to appeal the interlocutory dismissal order and also denied the trustee's request for certification of the dismissal order as final for purposes of appeal. Eventually, the district court withdrew its reference to the bankruptcy court as to various aspects of the case, and a jury trial was held in district court on the remaining claims. The trustee appealed several issues, including the bankruptcy court's dismissal of the fraudulent transfer claims. The court of appeals held that it did not have jurisdiction to review the bankruptcy court's dismissal order because its authority was limited to review of district court judgments, and the trustee had not secured a district court judgment resolving any of the fraudulent transfer claims. In so holding, the court of appeals noted:

> [O]ur inability to address the merits does not rest on an equitable objection. Rather, it rests on the simple fact that our authority is to review judgments of the district court, and Brandt never secured a district court judgment on the fraudulent transfer claims nor is it apparent how he could do so now.

*Brandt v. Wand Partners,* 242 F.3d 6, 15 (1st Cir.2001).

ted). A trial court's grant of summary judgment, as well as its determination that there are no issues of material fact in dispute, are reviewed *de novo.* *See Canzano v. Ragosa (In re Colarusso),* 382 F.3d 51, 57–58 (1st Cir.2004); *McCrory v. Spigel (In re Spigel),* 260 F.3d 27, 31 (1st Cir.2001); *Beatrice v. Braunstein (In re Beatrice),* 296 B.R. 576, 577 (1st Cir. BAP 2003). The specific standards of review applicable to each of the court's specific determinations will be discussed below.

### ISSUES ON APPEAL

1. Whether the district court erred by not dismissing the case due to lack of non-diverse indispensable parties.
2. Whether DCC lacked contractual standing to enforce the terms of the Subordination Agreement.
3. Whether the Subordination Agreement unambiguously limited the subordinated loans to those made by Rivera to Coachman prior to the execution of the Subordination Agreement.
4. Whether the district court erred in failing to apply Delaware's contra preferentem doctrine.
5. Whether the district court erred in refusing to consider extrinsic evidence of the parties' intent.
6. Whether DCC consented to repayments received and therefore waived rights under the Subordination Agreement.

### DISCUSSION

### I. Diversity jurisdiction

After the district court entered summary judgment on liability in favor of DCC, Rivera filed a motion to dismiss or stay due to the absence of allegedly indispensable parties—DCV and Coachman. Up until that moment, the district court's diversity jurisdiction had not been challenged. The district court did not dismiss the case, but instead referred the matter to the bankruptcy court after allowing Coachman and Olympic Mills to intervene in the case.

Rivera argues that the district court lacked diversity subject matter jurisdiction to enter judgment "due to the lack of joinder of Coachman and Olympic who are non-diverse indispensable parties." According to Rivera, because of this jurisdictional defect, the district court's summary judgment order was null and void, and the district court erred by not dismissing the case. We conclude that DCV, Coachman and Olympic Mills were not indispensable parties and that the district court was not compelled to dismiss the case.

### A. Complete Diversity

The statute conferring diversity jurisdiction has long been interpreted to require complete diversity—opposing parties may not be citizens of the same state. *See* 28 U.S.C. § 1332. The district court had diversity jurisdiction at the commencement of the action because DCC is a Delaware corporation and Rivera is a citizen of Puerto Rico. Since Coachman and Olympic Mills are also Delaware corporations, their joinder would have destroyed diversity.

### B. Indispensable parties

 Rivera argues that the district court erred by not dismissing the case for lack of joinder of Coachman and Olympic Mills who are non-diverse indispensable parties. This question is governed by Federal Rule of Civil Procedure 19 ("Rule 19") (compulsory joinder), which requires a two-step analysis. *See HB General Corp. v. Manchester Partners, L.P.,* 95 F.3d 1185, 1190 (3d Cir.1996). A court must first determine whether the absent party is "necessary" under Rule 19(a). If the

absent party is not "necessary," the analysis ends. *See id.* If, however, the absent party is "necessary" under Rule 19(a) but joinder of that party is "not feasible"—because, *inter alia,* joinder would destroy diversity jurisdiction—the court must apply Rule 19(b) to determine whether, "in equity and good conscience," the party is "indispensable." *See id.* If the court determines that the party is indispensable, the action must be dismissed. *See id.* Rule 19 determinations as to indispensable parties are reviewed for abuse of discretion in this circuit. *See United States v. San Juan Bay Marina,* 239 F.3d 400, 403 (1st Cir.2001).

### 1. DCV

■ Although Rivera argued to the district court that DCV was an indispensable party, he did not make that argument to the bankruptcy court or on appeal.[6] Nonetheless, we conclude that DCV was not a "necessary" party under the standard set forth in Rule 19(a). Under Rule 19(a), a person is "necessary" if: (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. *See* Fed.R.Civ.P. 19(a).

First, we cannot conclude that complete relief could not be afforded in DCV's absence from the case. In this case, DCC's interests (as general partner) are identical to DCV's interests (as the partnership), and the district court did not need to have authority over DCV in order to grant DCC the relief sought. As DCV's general partner, DCC had a fiduciary duty to protect the partnership's interests, and had the power and authority required to protect those interests. *See Acton Co., Inc. v. Bachman Foods, Inc.,* 668 F.2d 76, 78 (1st Cir.1982). Therefore, this case is distinguishable from cases where the courts have found the partnership to be an indispensable party, such as where the partnership is a named defendant or the claim is derivative in nature. *See HB General,* 95 F.3d at 1194 (citing *Bankston v. Burch,* 27 F.3d 164, 167–68 (5th Cir.1994); *Buckley v. Control Data Corp.,* 923 F.2d 96, 98 (8th Cir.1991)). While DCV claims an interest in the funds which are the subject of the action, disposition of the action would not impair DCV's ability to protect its interest. Moreover, Rivera is not prejudiced by DCV's absence from the litigation. Inasmuch as DCV can only act through DCC, its general partner, Rivera is not at risk of incurring double, multiple, or otherwise inconsistent obligations. Accordingly, DCV is not a necessary party under Rule 19(a), and the analysis ends with respect to DCV.

### 2. Coachman and Olympic Mills

■ There is no doubt that even if Coachman and Olympic Mills were "necessary" parties,[7] joinder was not feasible be-

---

6. In his motion to dismiss filed with the district court, Rivera argued that both Coachman and *DCV* were indispensable parties. However, Rivera did not make any argument regarding DCV in either his bankruptcy court motions or in his appellate brief. Rather, he argued that Coachman and *Olympic Mills* were indispensable parties.

7. The district court implicitly determined that Olympic Mills and Coachman were necessary parties when it allowed them to intervene in the district court proceedings pursuant to Fed.R.Civ.P. 24. *See* Advisory Committee Note to Rule 24 (noting that a person is entitled to intervene when his position is com-

cause diversity would have been destroyed. The question becomes whether this case could, in equity and good conscience, proceed without Coachman and Olympic Mills. Rule 19(b) lists four factors to consider when deciding if a party is indispensable:

(1) the extent to which judgment rendered in the party's absence might be prejudicial to that party or those already parties;

(2) the extent to which the court could lessen or avoid the prejudice by entering protective provisions or shaping the relief accordingly;

(3) whether a judgment rendered in the party's absence will be adequate; and

(4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

*See* Fed.R.Civ.P. 19(b).

Rivera claims that Coachman and Olympic Mills are indispensable parties because Coachman and the other debtors have competing claims over the same *res.* We disagree. DCV had claims against Rivera directly and not just against the *res.* Rivera is personally liable for breach of contract for receiving payments in violation of the Subordination Agreement. In addition, Rivera is personally liable for breach of trust for violating ¶ 4 of the Subordination Agreement (which required him to hold in trust payments made on the subordinated debt). Under applicable Delaware law, Rivera's failure to immediately turn over those funds, as he was required to do pursuant to his trust obligations, gave rise to liability against him rather than a claim against the *res.* Therefore, DCV's claims were not limited to claims against the *res.*

Rivera also argues that Coachman is an indispensable party because it was a party to the contract. Rivera cites several decisions for the proposition that, generally

parable to that of a "necessary" party as

speaking, all parties to a contract must be joined. *See, e.g., H.D. Corp. v. Ford Motor Co.,* 791 F.2d 987 (1st Cir.1986); *Acton Co.,* 668 F.2d 76; *Rivera Rojas v. Loewen Group Int'l, Inc.,* 178 F.R.D. 356, 362 (D.P.R.1998) ("A contracting party is the paradigmatic example of an indispensable party"). Each of these cases involves application of the indispensable party rule to compel joinder of joint obligees (those to whom a duty is owed), rather than joint obligors (persons who owe a duty of performance).

These cases are distinguishable from the present case because Coachman is an obligor under the Subordination Agreement, rather than an obligee. This distinction is significant because many courts have concluded that only joint obligees are indispensable parties; joint obligors are not indispensable. *See, e.g., Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,* 11 F.3d 399, 405 (3d Cir.1993) (finding that not all parties to contract are necessary under Rule 19(a) because only one potential defendant is necessary when all potential defendants are joint and severally liable under applicable state law). Such courts have concluded that there is no hard and fast rule that requires all parties to a contract to be joined as parties in a breach of contract suit that is before a federal court sitting in diversity. *See HB General,* 95 F.3d at 1190 (refusing to join limited partnership entity who was signator to subordination agreement when each limited partner was already before the court); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 184 F.Supp.2d 55 (D.Mass.2001) (obligors in contract actions are not necessary, much less indispensable parties to contract action). As one commentator noted:

defined by Rule 19(a)).

Today the joinder of obligors is left to plaintiff's discretion by many courts and he may select defendants without being concerned about dismissal because of nonjoinder. Joint obligors thus are treated as Rule 19(a) parties, but are not deemed indispensable under Rule 19(b).... Joint obligees, on the other hand, usually have been held indispensable and their nonjoinder has led to a dismissal of the action.

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7 *Federal Practice and Procedure* § 1613 (3d ed.2001). Accordingly, the district court and bankruptcy court did not err in determining that Coachman is not an indispensable party.

## II. Standing

 Rivera argues that the district court erred in granting partial summary judgment in favor of DCC because DCC lacked standing to enforce the Agreement. We disagree.

The capacity to sue and be sued in federal court is governed by Federal Rule of Civil Procedure 17 ("Rule 17"), which provides that "a party authorized by statute may sue in that party's own name without joining the party for whose benefit the action is brought." Fed.R.Civ.P. 17(a). DCC had authority to sue on DCV's behalf under the applicable Delaware statute.

Under Delaware's Revised Limited Partnership Act, the general partner of a limited partnership is authorized to enforce the rights and obligations of the limited partnership. *See* Del.Code Ann. tit. 6, § 17–101, *et seq.* Therefore, in Delaware, general partners have the power to sue directly on behalf of the partnership on the partnership's claims. *See HB General,* 95 F.3d at 1194 (citing *Thompson Door Co. v. Haven Fund,* 351 A.2d 864, 865 (Del.

1976) ("Each [general] partner has the power to use ordinary legal process to enforce obligations owed the partnership and therefore may engage counsel to sue on behalf of the firm")). The power to sue "on behalf" of a partnership does not mean that the partnership itself must be named as a party. Although Delaware has a "common name" statute which allows partnerships to sue and be sued in the partnership name,[8] its "use, although often convenient, *is not mandatory." Furek v. University of Delaware,* 594 A.2d 506, 513 (Del.1991) (emphasis added). Accordingly, as a matter of law, DCC, as the general partner, was authorized to bring the district court action in its own name without naming DCV. *See HB General,* 95 F.3d at 1194. This statutory authority is further supported by the terms of DCV's Partnership Agreement, which provides that the general partner "shall have the rights and powers which may be possessed by a general partner under the [Delaware Revised Uniform Limited Partnership] Act, and any such rights and powers as are otherwise conferred by law or are necessary, advisable or convenient to the discharge of its duties ..." Partnership Agreement, § 10.1.

 Rivera argues, however, that ¶ 13 of the Subordination Agreement waived DCC's legal authority to enforce DCV's contractual rights under the Subordination Agreement. Paragraph 13 of the Subordination Agreement provides:

This Agreement shall be binding upon the successors and assigns of the Subordinating Creditor [Rivera] and the Borrower [Coachman] and shall inure to the benefit of Lender [DCV], the Lender's successors and assigns, any lender or lenders refunding or refinancing any of the Senior Debt and their respective

---

8. *See* Del.Code Ann. tit. 10, § 3904.

successors and assigns, but shall not otherwise create any rights or benefits for any third party.

Rivera argues that this paragraph waived all rights of third parties (such as DCC) to enforce the Subordination Agreement, and, therefore, that DCC lacked contractual standing to enforce the Subordination Agreement since DCC was not a contracting party. We find this argument to be unconvincing. First, DCV, as the limited partnership, did not have the authority to waive DCC's statutory rights as a general partner without its consent. Second, we simply cannot conclude that the evidence unequivocally establishes that DCC, who as the general partner is obligated to act in the interest of the partnership, intended permanently to waive its authority to enforce the Subordination Agreement on DCV's behalf.

Accordingly, we conclude that under Delaware law, DCC, as DCV's general partner, was authorized to enforce DCV's rights and sue in its own name, and it did not waive that right.

## III. Unambiguous agreement

Rivera argues that the district court erred by disregarding the clear and unambiguous text of the Subordination Agreement. The Subordination Agreement provides that Delaware law applies to all disputes arising out of the agreement, and under Delaware law, construction and/or interpretation of contract language is a question of law. *See Rhone–Poulenc Basic Chem. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). Thus, we must review the district court's determination *de novo*.

Under Delaware law, courts are required to give effect to the clear and unambiguous text of contracts. *See Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del.Super.Ct.1997). If the plain meaning of the contract is clear on its face, the court may not consider extrinsic evidence or parol evidence to interpret the intent of the parties, to vary the terms of the contract, or to create ambiguity. *See O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 289 (Del.Super.Ct.2001). If the language of the contract is clear, it will be the sole source for determining intent. *See City Investing Co. Liquidating Trust v. Continental Casualty Co.*, 624 A.2d 1191, 1198 (Del.1993).

A determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law. *See Beal Bank SSB v. Lucks*, 791 A.2d 752, 759 (Del.Ch.2000). The test for ambiguity is whether terms within an agreement are reasonably susceptible of different meanings. *See New Castle County v. Nat'l Union Fire Ins. Co.*, 174 F.3d 338, 342–44 (3d Cir.1999). The Delaware Supreme Court has instructed:

A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. Ambiguity does not exist where the court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends. Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty. *The true test is not what the parties to the contract intended to mean, but what a reasonable person in the position of the parties would have thought it meant.*

*Rhone–Poulenc*, 616 A.2d at 1196 (internal citations and quotation marks omitted) (emphasis added).

■ Rivera argues that the unambiguous terms of the Subordination Agreement show that only those loans made to Coachman *prior* to the signing of the Subordination Agreement were subject to subordination. Thus, we turn to the text of the Subordination Agreement. Paragraph 1.b. defines "subordinated debt" as follows:

"Subordinated Debt" shall mean all principal, interest, fees, costs, enforcement expenses (including legal fees and disbursements), collateral protection expenses and other reimbursement and indemnity obligations that the Subordinating Creditor has loaned to the Borrower or any of its affiliates.

Rivera argues that the phrase "has loaned" is in the past tense and therefore limited the subordinated loans to those made by Rivera prior to the signing of the Subordination Agreement. DCC argues that the term "shall mean" makes it clear that the definition of subordinated debt was not fixed in time.

A careful reading of the contract language shows that the Subordination Agreement did not specifically limit the subordinated debt with the inclusion of a temporal cut off. If the parties intended to limit the subordinated debt to a specific loan or a specific amount, they could have clearly stated such a limitation in the Subordination Agreement. Moreover, Rivera's interpretation would render the phrase "to the Borrower or any of its affiliates" superfluous. If the parties intended the Subordination Agreement to be limited to a specific loan made to Coachman, they would not have included "any of its affiliates" in the definition of subordinated debt. There is further persuasive language in the Subordination Agreement. Paragraph 7 provides:

Subordination. The Senior Debt and the Note and any and all other documents, instruments evidencing or creating the Senior Debt and all guaranties, mortgages, security agreements, pledges and other collateral guarantying or securing the Senior Debt or any part thereof shall be senior to the Subordinated Debt *irrespective of the time* of the execution, delivery or issuance thereof.

(emphasis added). Therefore, a careful reading of the contract language, from the perspective of a reasonable person, shows that the Subordination Agreement unambiguously allowed for subordination of all loans made by Rivera to Coachman, regardless of when the loans were made.

Rivera's argument is not helped any by the fact that the Convertible Subordinated Demand Note, signed in conjunction with the Subordination Agreement, defines the subordination agreement as "the Subordination Agreement ... by Mr. Luis Rivera to subordinate and defer repayment of the principal of *any loan* by him to [Coachman]" or its affiliates "until this Note is converted or repaid." (emphasis added). Thus, the language of both the Subordination Agreement and the demand note clearly indicate that all of Rivera's loans to Coachman and its affiliates were to be subordinated to DCV's loan to Coachman.

Rivera also argues that the district court erred by disregarding ¶ 4 of the Subordination Agreement, which he says limited the repayments of the Subordinated Debt to be held in trust to only those made or disbursed *by Coachman*. Paragraph 4 provides:

*Payments Held in Trust.* The Subordinating Creditor will hold in trust and immediately pay over to the Lender, in the same form of payment received, with appropriate endorsements, for application to the Senior Debt any cash amount that the Borrower pays to the Subordinating Creditor with respect to the Subordinated Debt, or as collateral for the Senior Debt *any other assets of the Bor-*

rower [Coachman] that *the Subordinating Creditor may receive* with respect to the Subordinated Debt, in each case except with respect to payments expressly permitted pursuant to Section 2 hereof. According to Rivera, because some of the repayments were actually made by Coachman's subsidiaries, Olympic Mills and Glamourette, they are not subject to subordination. Rivera's argument is undermined by an examination of Rivera's expert report, which shows that Rivera completely disregarded corporate formalities, treating Coachman and its affiliates as one entity. The record shows that Rivera repeatedly used funds from one company to pay the obligations of others, and failed to properly document transactions made by any of the entities. Therefore, the district court did not err in determining that the payments received by Rivera were made by Coachman.

## IV. Contra Preferentem Rule

Rivera argues that the district court erred by failing to apply Delaware's contra preferentem rule of contract interpretation "after it implicitly found that the Subordination Agreement was ambiguous." We disagree.

 As noted above, under Delaware law, the test for ambiguity is whether the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. The doctrine of *contra preferentem* requires that confusing and ambiguous language in a contract must be construed against the drafter. *See Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146, 1149–50 (Del.1997) ("If the contract . . . is ambiguous, the principle of contra preferentem dictates that the contract must be construed against the drafter."). "Contra preferentem only applies after a determination of ambiguity is

made." *New Castle County v. Nat'l Union Fire Ins. Co.*, 243 F.3d 744, 752 n. 6 (3d Cir.2001). Before a reviewing court can apply contra preferentem, it must first review whether the disputed phrase was ambiguous. *Id.*

Rivera claims that the district court implicitly found the Subordination Agreement to be ambiguous because it considered DCC's extrinsic evidence to interpret the Subordination Agreement. We disagree. The Subordination Agreement is unambiguous and, therefore, the contra preferentem rule did not apply.

## V. Parties' Intent

 Rivera argues that the district court also erred when it "implicitly found the Subordination Agreement ambiguous but then refused to consider [Rivera's] admissible and competing extrinsic evidence on contractual intent." The district court did not find (implicitly or explicitly) that the Subordination Agreement was ambiguous. Because the Subordination Agreement is not ambiguous, no extrinsic evidence was necessary to resolve any ambiguity. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity"). Accordingly, we conclude that the district court did not err in refusing to consider Rivera's offers of intent.

## VI. Consent/Estoppel Defense

 Finally, we return to the merits of the bankruptcy court's grant of summary judgment in favor of DCC. The sole remaining issue before the bankruptcy court was the issue of the precise amount of damages to the plaintiff. After a hearing, the bankruptcy court entered summary

judgment in favor of the plaintiff, awarding damages in the amount of $2,363,500 in principal, plus $1,160,038.51 in interest, plus 12% per annum post judgment interest on any uncollected amount until paid. Rivera argues that the bankruptcy court erred in refusing to consider Rivera's defense that DCV had expressly consented or knowingly acquiesced to certain repayments, thereby waiving its subordination rights as to certain payments.

In its effort to resolve contract disputes, we look first to the contract itself. In some cases, a contract provision, to which the parties previously and privately agreed, anticipates the area of discontent and provides a resolution to the conflict. *See Continental Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219 (Del.Ch.2000). Where contract language speaks to a particular dispute, the court must give those privately negotiated and agreed upon terms their full and plain meaning. *Id.* Paragraph 13 of the Subordination Agreement does, in fact, speak to waivers of the terms of the Subordination Agreement. It provides as follows:

> The Lender, may, in its sole and absolute discretion, waive any provisions of this Agreement benefiting the Lender; *provided, however,* that such waiver shall be effective only if *in writing* and signed by the Lender and shall be limited to the specific provision or provisions expressly so waived.

Agreement, ¶ 13 (emphasis in original). Thus, the Agreement's no-oral-waiver clause clearly and unequivocally indicates the intention of the parties that there be no modifications or waivers of the contract provisions except in a writing signed by DCV. *See National Data Payment Sys. v. Meridian Bank,* 212 F.3d 849, 855 (3d Cir.2000).

Rivera argues that DCV waived its subordination rights in a letter dated April 14, 2000 by Wayne Foren ("Foren Letter"), acting as DCV's member of the Companies' Board of Directors, requesting Rivera to grant Olympic Mills and Glamourette several post-Subordination Agreement loans and credits. According to Rivera, the Foren Letter expressly provided that several of the new post-Subordination Agreement loans would be exempted from the terms of the Subordination Agreement. Rivera's reliance on the Foren letter as supporting a written waiver of DCV's subordination rights is misplaced. The letter was merely a "proposal" that Rivera "capitalize leasehold improvements" and extend credit at "3% over cost of funds." Rivera failed to show that DCV ever expressly waived its subordination rights by virtue of the Foren Letter.

■■■ Rivera next argues that, notwithstanding the no-oral-waiver clause, DCV's course of conduct constitutes an implied waiver of subordination rights. According to Rivera, since Foren acquiesced to repayments without demanding compliance with the Subordination Agreement, the course of dealings between the parties evidenced that "DCV expressly and implicitly waived its subordination rights." It is well settled that contract provisions deeming oral modifications unenforceable can be waived by course of conduct just like any other contractual provision. *See Continental Ins. Co.,* 750 A.2d at 1229. However, under Delaware law, a party asserting an oral modification (or waiver) must prove the intended change with "specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document." *Id.* "In an effort to screen out parties' attempts to single-handedly change contracts under the guise of oral modifications, courts have established a high evidentiary burden for parties asserting such changes. Delaware

law certainly continues to recognize the viability of oral modifications of contracts, but these alterations must be proven with 'specificity and directness.'" *Id.*

Rivera claims that since Foren did not specifically demand compliance with the Subordination Agreement, DCV is estopped from asserting its subordination rights. A party must establish three elements to succeed on a claim of equitable estoppel: (1) a material misrepresentation; (2) reasonable and detrimental reliance upon the representation; and (3) extraordinary circumstances. *See In re New Valley Corp.*, 89 F.3d 143, 153 (3d Cir.1996). Consequently, to obtain relief from enforcement of the Subordination Agreement under the doctrine of equitable estoppel, Rivera must prove three elements by the preponderance of the evidence: (1) DCV, through misleading conduct, led Rivera to reasonably infer that it did not intend to enforce its subordination rights; (2) Rivera relied on DCV's misleading conduct; and (3) material prejudice resulted to Rivera. Silence may give rise to the defense of equitable estoppel only when coupled with either affirmative conduct or an affirmative obligation. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed.Cir.1992). In this case, in the absence of any evidence of a duty to speak, Foren's silence cannot constitute the basis for a charge of equitable estoppel as a matter of law. *See id.* at 1042 ("Silence alone will not create an estoppel unless there was a clear duty to speak."). Based on the record, we cannot conclude that the bankruptcy court erred in refusing to find that DCV waived its subordination rights.

### CONCLUSION

Accordingly, for the reasons set forth above, we AFFIRM.

---

**9.** The First Circuit Judicial Council established the First Circuit Bankruptcy Appellate

VOTOLATO, U.S. Bankruptcy Appellate Panel Judge (dissenting in part and concurring in part).

I write separately to voice my disagreement with the action of the Majority (and the bankruptcy judge in the case), to review a District Court order, as a part of this appeal. The Majority's broad statement that appellate courts can review earlier nonfinal decisions, while true, simply does not apply to the facts of this case.

Bankruptcy Appellate Panel (BAP) jurisdiction is derived from 28 U.S.C. § 158 which provides:

(a) The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees; (2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and (3) with leave of the court, from other interlocutory orders and decrees;

and, with leave of the court, from interlocutory orders and decrees, *of bankruptcy judges* entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

(b)(1) The judicial council of a circuit shall establish a bankruptcy appellate panel service[9] composed of bankruptcy judges of the districts in the circuit who are appointed by the judicial council in accordance with paragraph (3), to hear and determine, with the consent of all the parties, appeals under subsection (a)....

---

Panel Service on June 13, 1996.

28 U.S.C.A. § 158 (emphasis added). A bankruptcy appellate panel is duty-bound to determine its jurisdiction before proceeding to the merits, even if not raised by the litigants. *See In re George E. Bumpus, Jr. Constr. Co.*, 226 B.R. 724 (1st Cir. BAP 1998). I feel strongly that neither *this* appellate court, i.e., the BAP, nor the bankruptcy judge in the case below have authority to review orders of the District Court, whether they are interlocutory or final, and that regardless of the circumstances, this Panel may not exercise jurisdiction where none existed in the first place. *See Brandt v. Wand Partners*, 242 F.3d 6 (1st Cir.2001). In *Brandt*, the trustee filed a complaint against various defendants, including several counts alleging fraudulent conveyances. *Id.* at 11. Some of the defendants claimed jury trials, and prior to withdrawal of the reference by the district court to conduct the jury trials, the bankruptcy judge dismissed the trustee's fraudulent transfer claims. *Id.* There was no motion for reconsideration or to appeal this interlocutory order. After losing the jury trial issues in the district court on his remaining claims, the trustee filed a notice of appeal to the First Circuit Court of Appeals and attempted to include within the appeal, the bankruptcy court's dismissal of the fraudulent transfer claims. *Id.* The First Circuit concluded that it lacked jurisdiction to hear the appeal of the bankruptcy court's interlocutory orders dismissing the fraudulent conveyance claims, stating:

> [O]ur inability to address the merits does not rest on an equitable objection. Rather, it rests on the simple fact that our authority is to review judgments of

the district court, and Brandt never secured a district court judgment on the fraudulent transfer claims nor is it apparent how he could do so now.

*Id.*

Under exactly the same reasoning, this Panel only has jurisdiction to review orders, decisions, and decrees of a bankruptcy judge. *See* 28 U.S.C. §§ 158(a) & (b)(4). Quite simply, and with no ambiguity, the December 16, 2002, *District Court* order granting the plaintiff's motion for partial summary judgment is not something we have the power to review. That the bankruptcy judge "affirmed the district court" does nothing to cure the jurisdictional void, and the Majority has said nothing to distinguish or distance this case from *Brandt*, which I believe is very instructive, and in fact, controlling.

The Majority disposed of the jurisdictional issue apparently on equitable or *cure the anomaly* grounds, which are addressed below. To begin with, the bankruptcy court's only authority to hear the subject adversary proceeding came from the District Court's discreet order of reference, and even if the District Court intended [10] to confer or assign to the bankruptcy court the authority to review its interlocutory order on liability, and even if said intent were made abundantly clear in the order of reference, which it did not do, the District Court's authority to delegate jurisdiction in such a fashion is most problematic.

In concluding that it, too, has jurisdiction to review said order, the Majority states:

> We are mindful of the unusual situation created by the current state of facts.

**10.** On the same day it referred this case to the bankruptcy court, the district court denied Rivera's pending motion for reconsideration of the December 16th order. To the extent that it *might* be relevant, this is indicative of the district court's intent, i.e., that it intended that the bankruptcy court deal only with quantifying Rivera's liability under its December order, and by no stretch should it be inferred that the district court intended to authorize the bankruptcy court to review its summary judgment ruling on the merits.

We recognize, however, the serious issues presented if we do not have jurisdiction. The Appellant could end up in an anomalous position such as existed in *Brandt v. Wand Partners, supra,* or be forced to seek an immediate appeal from the district court, or ask the bankruptcy court to make proposed findings and ruling and forward the same to the district court for a final order. We do not believe any of these alternatives present a realistic alternative for an appellant. Majority Opinion, at 548–49 (footnote omitted).

I question the authority to treat the problems pointed out by the Majority as a basis for inventing jurisdiction in the Appellant's behalf. To begin with the "unusual and anomalous position" in which the Appellant finds itself was created by none other than the Appellant, when it failed to seek an immediate appeal from the District Court, or ask the bankruptcy court for proposed findings and conclusions "and forward[ing] the same to the district court for a final order." *See* Majority Opinion, at 549. That the Majority "do[es] not believe any of these alternatives present a realistic alternative for an appellant" is irrelevant, as the BAP is not in the business of providing realistic alternatives to litigants faced with unusual situations.

The *anomalous position* or *unusual situation* which troubles the Majority to the point that compels it to exercise jurisdiction, I believe, is mischaracterized. The real anomaly here is the thought of a bankruptcy judge or BAP judges sitting in review of a district judge's rulings. The path taken by the Majority goes way beyond our job description as bankruptcy judges or as BAP judges and runs afoul of deeply rooted Congressional mandates going far back in bankruptcy history, as reiterated in the 1978, 1984, and 2005 Amendments. The statutory limitations are clear, and no amount of attempted *problem solving* can change that.

Finally, taking the *anomalous position* example a step further, and imagine that this appeal went to the District Court rather than to the BAP. Is it reasonable to envision a district judge ruling upon matters previously decided by a District Court colleague who presides just down the hall? I think not.

For the reasons discussed above, I would accept the District Court's order as the law of the case and reverse in its entirety the bankruptcy judge's *review and approval* of the District Court order, and for purposes of this appeal would only review the bankruptcy judge's rulings on damages. Because I agree with the Majority's analysis of the bankruptcy judge's calculation of damages (Part VI of its Opinion), I join the Majority in affirming that part of the bankruptcy judge's order.